# Illinois Official Reports

## Appellate Court

---

### *People v. Shanklin*, 2014 IL App (1st) 120084

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TONY SHANKLIN, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-12-0084 |
| Rule 23 Order filed<br>Rule 23 Order<br>withdrawn<br>Opinion filed | December 20, 2013<br><br>January 28, 2014<br>January 31, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions and sentences for first-degree murder and aggravated criminal sexual assault were upheld where the trial court did not err in finding that certain test results with regard to his susceptibility to interrogation techniques used by the police did not meet the *Frye* standard for admissibility, defendant's motion to suppress his inculpatory statements on the ground that they were involuntary due to his low IQ and his withdrawal from drug abuse was properly denied, and the trial court did not rely on any improper factors in sentencing defendant. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 04-CR-13517; the Hon. Mary Margaret Brosnahan, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Michael J. Pelletier and Darren E. Miller, both of State Appellate Defender's Office, of Chicago, for appellant. |
| | |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Peter D. Fischer, Assistant State's Attorneys, of counsel), for the People. |
| | |
| Panel | PRESIDING JUSTICE ROCHFORD delivered the judgment of the court, with opinion. |
| | Justices Lampkin and Reyes concurred in the judgment and opinion. |

## OPINION

¶ 1    A jury convicted defendant, Tony Shanklin, of three counts of first-degree murder, one count of home invasion, and two counts of aggravated criminal sexual assault. The trial court merged the home invasion count and the three first-degree murder counts into one count of first-degree murder, and sentenced defendant to a 60-year term of imprisonment for the first-degree murder conviction and to two 25-year terms of imprisonment for the aggravated criminal sexual assault convictions, all to be served consecutively. On appeal, defendant contends: (1) the trial court erred in holding a hearing pursuant to *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923) (*Frye* hearing) to determine the admissibility of certain test results regarding his susceptibility to interrogation techniques and in finding that those test results did not meet the *Frye* standard for admissibility; (2) the trial court erred in denying his amended motion to suppress where the State failed to prove his inculpatory statements were voluntary; and (3) the trial court relied on an improper factor in imposing sentence. We affirm.

¶ 2    On June 18, 2004, a 33-count indictment was filed against defendant regarding the November 30, 2003, murder of Virginia Warren. Included among the charges were various counts of first-degree murder, aggravated criminal sexual assault, residential burglary, home invasion, and armed robbery. Defendant filed a motion to suppress statements on September 5, 2007, and an amended version of that motion on March 12, 2009.

¶ 3    In his amended motion to suppress, defendant alleged that at the time of his police interrogation, he was suffering from heroin withdrawal, possessed significantly impaired cognitive functioning, and was highly suggestible, thereby making his resulting statements involuntary. Defendant tendered a psychological report wherein Dr. James P. Sullivan opined on defendant's suggestibility based in part on the Gudjonsson Suggestibility Scale (GSS). The State then filed a motion for a *Frye* hearing. The State claimed that the GSS is unreliable and does not meet the *Frye* standard, and that testimony regarding suggestibility invades upon the province of the trier of fact. Defendant filed a motion to strike the State's motion for a *Frye*

hearing. After hearing argument and taking the matter under advisement, the trial court granted the State's motion and ordered the *Frye* hearing to be conducted in conjunction with the hearing on the amended motion to suppress statements.

¶ 4                                     I. The *Frye* Hearing

¶ 5        Dr. James Sullivan testified for the defense as an expert in forensic neuropsychology. Dr. Sullivan testified that the GSS is "specifically designed to identify individuals who may demonstrate decreased resistance to subtle pressure or interrogative techniques. Oftentimes individuals who are identified as being more suggestible by virtue of the results of the GSS have been shown through research to have provided more erroneous information during statements they provide to the police." Dr. Sullivan testified that the GSS provides information about psychological factors relevant to the issue of coercion but that he would "never include [GSS results] for the purpose of being dispositive or offering a final conclusion about whether an individual's statement is voluntary or not."

¶ 6        Dr. Sullivan testified that the GSS has been around since the mid-1980s and has been the subject of all sorts of research and has undergone a whole process of validation. Dr. Sullivan stated that the GSS is widely accepted "in forensic clinical psychology regarding *Miranda* issues" because it is widely described in the literature. He pointed to references to the GSS in the *Handbook of Psychology, Volume 11: Forensic Psychology* (2003), by Allen M. Goldstein, and *Psychological Evaluations for the Courts*, by Gary B. Melton *et al*. (3d ed. 2007), which is a handbook for mental health professionals and lawyers and is "pretty widely acknowledged as the authoritative text for psychological involvement in the legal system." Both books identify the GSS as a measure to assess suggestibility in *Miranda* evaluations.

¶ 7        Dr. Sullivan opined: "There is no question that [the GSS] is accepted in the field in which I am an expert [forensic neuropsychology]. I would like to say, though, *** that the field in which I am an expert is a relatively small field." Dr. Sullivan explained that the GSS provides a story and then asks the subject questions about the story, many of the questions being leading. The GSS gives a yield measure of how many of the leading questions the subject gave in to. After answering the questions the subject is told he did not do a very good job and is told to try harder, and he is asked the same questions again. The frequency with which the subject changes his answers is called shift and is thought to be an indication of interrogative pressure.

¶ 8        In the instant case, Dr. Sullivan administered the GSS to defendant. Defendant's yield score was 11, which places him at the 95th percentile of the normative sample. His shift score was 7, which places him at the 90th percentile, so that his total suggestibility score was 18. Looking at the normative data, this places him in the high end of the continuum (*i.e*, defendant is highly suggestible).

¶ 9        Dr. Sullivan testified that a person with a criminal record who has had multiple "contacts with the justice system" is generally less suggestible than a person who has not had such contacts. When administering the GSS to defendant, Dr. Sullivan was not aware of defendant's extensive criminal history, *i.e*., of his prior "contacts with the justice system" consisting of seven felony convictions.

¶ 10       Dr. Sullivan conceded there has been a lot of criticism of the GSS because Mr. Gudjonsson's normative data comes from Iceland and the United Kingdom and there are cultural and vocabulary differences between the United States and those countries. Dr. Sullivan stated, though, that the fact the GSS has been criticized does not mean it has not been widely accepted.

¶ 11       Dr. Sullivan admitted that Bruce Frumkin, a psychologist who wrote a chapter in a book he edited, stated in 2003 that "although Gudjonsson's work is well known in the area of suggestibility research, it has not been widely used by forensic clinicians in the United States." In 2008, Frumkin stated that the GSS is a specialized forensic assessment instrument "unknown to many psychologists."

¶ 12       Dr. Sullivan was also aware of a survey in the publication *Professional Psychology Research and Practice* in 2003 regarding tests used in forensic psychological evaluations, and that the GSS was not mentioned therein. The same was true for a survey in the *Journal of Personality Assessment*.

¶ 13       Dr. Joan Leska testified for the defense as an expert in forensic psychology. She testified that the GSS is not a new or novel test; the first version came out in 1987 and the second version came out in 1997. Dr. Leska opined that the GSS is generally accepted in the forensic psychological community. The GSS is referenced in: *Psychological Evaluations for the Court*, by Melton; the *Handbook of Psychology*, by Goldstein; and *Interrogation and Disputed Confessions: A Manual for Forensic Practice* (2005), by Gregory Declue, Ph.D. The GSS has been referenced in workshops that Dr. Leska has attended at the American Academy for Forensic Psychologists and she has used it herself over 20 times.

¶ 14       Dr. Leska testified that the GSS "provides information to the trier of fact in terms of whether this person has certain characteristics that would make him or her more vulnerable to suggestion or to influence or to providing erroneous material." Dr. Leska agreed that the GSS is not a measure of someone's ability to understand *Miranda* and that the GSS has been criticized because it was normed on a British sample. However, Dr. Leska did not agree that the culture of America is different than the culture of the United Kingdom.

¶ 15       Dr. Leska was asked about a statement by Mr. Gudjonsson that the validity of the GSS in predicting suggestibility during an actual police interrogation was not known. Dr. Leska replied, "I would agree with that. There [have] been other studies that say in the actual situation we don't know." Dr. Leska further testified in pertinent part:

      "Q. Would you agree that there are different types of memory?

      A. Yes, I do.

      Q. And semantic memory is memory for concepts, words and objects, right?

      A. Correct.

      Q. And then there's episodic or event memory, correct?

      A. Episodic or autobiographical, correct.

      Q. Correct. And that's the individual's unique store of autobiographical memory, correct?

      A. Correct.

Q. Police interrogations are concerned with the autobiographical memory, correct?

A. It could be, if *** the person is involved in crime.

Q. But the GSS is testing semantic memory, correct?

A. Correct."

¶ 16 Dr. Leska also testified that a person with a criminal history who has had contacts with the criminal justice system is less suggestible than a person without such a criminal history.

¶ 17 Dr. Sharon Coleman testified for the State as an expert in forensic psychology. Dr. Coleman is a clinical psychologist with the Forensic Clinical Services of Cook County, which provides the court-ordered examinations for the circuit court of Cook County. Dr. Coleman testified she is familiar with the GSS but she does not use it because she does not "believe the GSS measures anything clinically relevant to the evaluations [she] performed at Forensic Clinical Services." She testified in pertinent part:

"Q. Are there problems with the way the GSS was standardized or normed?

A. I believe so, yes.

Q. What are the problems?

A. Typically, this test was normed on a population of British and some Icelandic citizens which those are the norms that are currently used with this test with American populations. *** Typically, standardized instruments use a population that's going to be representative of the population where the test is going to be used in. So one of the criticisms or problems that there is with the GSS is that the norms aren't necessarily representative of the American population in which its [*sic*] been used.

* * *

Q. To your knowledge, has there ever been any United States validation of the GSS?

A. There has been an attempt to look at how some American samples score on the GSS. ***

Q. Do you know what the results of the attempt were?

A. The results showed there were some distinct differences between how American samples score *** on certain measures of this test compared to the British counterparts.

Q. Would that affect where they would be placed if there were a scale suggestibility, would that affect where they would be placed relative to subjects from the United Kingdom?

A. Well, some of the percentile rankings for the British norm versus the American subjects don't–aren't necessarily *** consistent. So that if you have a percentile ranking at 75 percentile, it doesn't necessarily mean the same thing if you are testing somebody from an American population. ***

Q. How about cutoffs as it relates to assessing somebody's suggestibility? ***

A. Yes. There is a problem.

Q. What is the problem?

A. There is not operationalized diagnostic cutoff for what's considered high and low or high suggestibility or really high suggestible versus low suggestible.

Q. *** The subjects in the initial validation of the GSS, do you know what that status was in general?

A. I think that again one of the difficulties or problems with the normative samples of the GSS is that the normative sample did not just contain pretrial detainees but it also contained some individuals who *** were victims of crimes, some individuals who were witnesses of crimes, and some individuals who may have been already convicted of crimes. *** [T]he inclusion of that part of the population is problematic for the normative group.

* * *

Q. The fact that the GSS is based on a story that's told to somebody versus a custodial interrogation which involves *** a real life scenario, does that affect this test in any way?

* * *

A. Again, I think one of the criticisms and problems with the GSS is that it is a test that's administered verbally, a story that's relatively benign to the examinee ***. A custodial situation or an interrogation situation is not just experienced verbally and by hearing but rather it's something that a person has some experience with. *** When they are relaying information about a custodial situation, again, they are calling on not just what they hear, they are calling on what they have seen, what they have smelled, what they have touched and so a multiple sensory modality to relate information back as opposed to a testing situation which does not involve all those sensory modalities.

Q. No personal relevance in the story of the GSS?

A. Exactly."

¶ 18    Dr. Coleman testified she has conducted thousands of *Miranda* evaluations and reviewed the reports of other professionals and the GSS is not generally accepted within the office of Forensic Clinical Services. Dr. Coleman keeps up on surveys of what doctors in the psychological field are using for testing, and she stated that in the recent surveys "the GSS has not been mentioned as an instrument used prominently or by forensic psychologists." Dr. Coleman noted that Thomas Grisso, who is "well-known in the area of *Miranda* evaluations," had referenced the GSS in a 1986 book when discussing "the evaluation of *Miranda* abilities," but that by 2003, he had "reevaluated his view of the GSS as a useful tool in light of assessing *Miranda* abilities"; Grisso's 2003 edition of the book no longer contained a recommendation of the GSS. Dr. Coleman testified that "[t]he GSS has not gained general acceptance in the field of psychology."

¶ 19    Dr. Peter Lourgos, staff forensic psychiatrist and assistant director of Forensic Clinical Services, testified he never asks psychologists to test for suggestibility as it "is not a useful assessment in these types of evaluations." He stated that suggestibility is not a psychiatric diagnosis, it is not listed in the Diagnostic and Statistical Manual of Mental Disorders, and "there is no formalized definition of what it is to be suggestible."

¶ 20     At the conclusion of the *Frye* hearing, the trial court concluded "there is not general acceptance of the GSS in the forensic psychology community." Accordingly, the trial court found that the GSS did not meet the *Frye* standard and barred consideration of such evidence at the hearing on the amended motion to suppress and at trial.

¶ 21                    II. The Hearing on the Amended Motion to Suppress Statements

¶ 22     Defendant contended his statements to the police and to the assistant State's Attorney (ASA) were involuntary because he suffered from a "significantly comprised cognitive function" and because he was a heroin addict undergoing severe withdrawal at the time he made his statements.

¶ 23                    A. Evidence Regarding Defendant's Cognitive Functioning

¶ 24     Dr. Sullivan testified that Dr. Leska administered an IQ test to defendant in 2006 and his full scale IQ is 70, putting him in the second percentile of his age cohort. That puts him in the borderline, but not impaired, range. His verbal subscore is 74, putting him in the fourth percentile. In August 2008, Dr. Sullivan conducted an evaluation of defendant to assess his cognitive functioning and his "competence to confess." As part of the evaluation, Dr. Sullivan conducted a clinical interview of defendant so as to gather biographical information and personal history. During the interview, defendant reported having been hit in the head with a machete in 1995. Dr. Sullivan administered to defendant neuropsychological screening measures shown to have predictive power to identify brain damage. Defendant performed in the impaired range on these tests. Dr. Sullivan next administered a test of academic capability in which defendant performed at the third-grade level in math, the fourth-grade level in spelling and reading, and the eighth-grade level in sentence comprehension, meaning he is able to use context and figure out what things mean.

¶ 25     Dr. Sullivan testified he administered a set of four tests called the Grisso measures, which, taken as a whole, are designed to give the evaluator an idea about the subject's present capacity to appreciate and understand the *Miranda* warnings. Dr. Sullivan concluded, "Taken as a whole in the Grisso measures, there was no indication that when I saw [defendant] in August of '08 there was any difficulty with him appreciating and understanding *Miranda* rights."

¶ 26     Dr. Coleman testified that in May and June 2009, she met with defendant for a total of 5½ hours to evaluate him on his ability to understand *Miranda*. She also reviewed police reports, defendant's statements, and the reports of other experts. Dr. Coleman conducted a mental status exam to assess defendant's level of alertness, his orientation, and if there were any "symptoms that he may be experiencing that might interfere with his ability to communicate during the evaluation." Dr. Coleman found that defendant was very engaging, alert and oriented and his levels of reasoning, judgment and insight were adequate. Based on her interviews with defendant, her review of the records, reports and the videotaped confession, Dr. Coleman opined that defendant would have been able to understand his *Miranda* rights when he made his statements to the police and to the ASA.

¶ 27 Dr. Lourgos testified he reviewed the records in this case and evaluated defendant personally in July 2009. Dr. Lourgos specifically asked defendant about his *Miranda* rights and defendant demonstrated a clear understanding of those rights. Dr. Lourgos concluded defendant had the ability to understand his *Miranda* warnings at the time he made his statements.

¶ 28 Dr. Stafford Henry, a triple-board-certified private physician specializing in general, forensic, and addiction psychiatry, testified he met with defendant in February 2008 and discussed the *Miranda* warnings with him. Defendant demonstrated that he understood his *Miranda* rights; he was able to explain and paraphrase them. Dr. Henry concluded that at the time defendant made his statements, he possessed the capacity to knowingly and intelligently waive his *Miranda* rights. Dr. Henry further testified that defendant "was of average intelligence" and that "although he may not be highly educated, based on his sentence structure, given his memory, given his capacity to interact with [Dr. Henry], there is no evidence that [defendant] is cognitively impaired."

¶ 29 B. Evidence Regarding Defendant's Heroin Addiction and Withdrawal

¶ 30 The following evidence comes from the testimony of Detectives Kevin McDonald and Daniel Jacobs and ASA David Williams. Detectives McDonald and Jacobs first interviewed defendant at 9:15 a.m. on May 7, 2004, in an interview room. Defendant told them he was hungry and wanted something sweet to eat, so they gave him some coffee with sugar and cookies. He was allowed to use the bathroom. Defendant looked fine but he did appear a little nervous and tired. Defendant said he was a heroin user and had a $120-a-day habit. Detective Jacobs read defendant his *Miranda* rights, which defendant waived. They spoke for about 45 minutes.

¶ 31 The detectives met again with defendant at 10:30 a.m. at which time he was readvised of his *Miranda* rights and he said he understood them. This conversation lasted about 1 hour and 40 minutes. When the officers left the room, defendant said he wanted to sleep, so he was given a cot to use. About 4:45 p.m., defendant was allowed to use the bathroom. About 5 p.m., ASAs Williams and Dombrowski arrived at the police station. At 6:45 p.m., Detectives McDonald and Bogucki met with defendant, who was read his *Miranda* rights again and agreed to speak. They spoke for about 1 hour and 45 minutes and defendant gave an inculpatory statement. Defendant ate a meal from McDonald's and was given the extra ketchup he requested.

¶ 32 Around 9 p.m., defendant spoke to the ASAs and Detective McDonald. Around 10:30 p.m., defendant had some pizza and a soft drink. Defendant was asked how he wanted his statement recorded and he chose to give a handwritten statement. At 11 p.m., the ASAs took a handwritten statement from defendant.

¶ 33 At 9 a.m. the next morning, May 8, 2004, defendant was given his breakfast. ASA Williams returned to the police station around 5:30 p.m. that day, and Detective Jacobs informed him that defendant had asked to speak to him again. ASA Williams went into the room alone with defendant. Defendant told ASA Williams he now wanted to give a videotaped statement. The videotaped statement was taken at 8:53 p.m.

¶ 34 At no time did the detectives or ASAs have any trouble communicating with defendant. He did not appear to be in any distress, discomfort, or pain. He never said he did not understand his *Miranda* rights and he never asked for an attorney. He was not shaking or sweating. No one ever told defendant they would go out and get him some heroin if he confessed. Defendant never said he was sick and needed drugs, and he never vomited in the room. Defendant never complained of any physical discomfort or diarrhea. Defendant used the bathroom about the same number of times as any other prisoner. Defendant was never handcuffed to the wall in the interview room. Defendant was asked if he was under the influence of heroin and he said he was not; he was not asked if he was in withdrawal. ASA Williams said defendant was sniffling but not abnormally so.

¶ 35 In his signed, handwritten statement, defendant stated he was treated well by the police and the ASAs, that he was given food and drink and allowed to use the bathroom, that his statement was freely and voluntarily given, and that he was not under the influence of drugs or alcohol.

¶ 36 James O'Donnell testified for the defense as an expert in pharmacology. Mr. O'Donnell testified that heroin has a relatively short half-life, and withdrawal symptoms begin as soon as six to eight hours after the last dose was taken. The greatest intensity of withdrawals ranges from 18 to 72 hours after the last dose was ingested. If a person anticipates withdrawal, the effects are even greater.

¶ 37 Mr. O'Donnell interviewed defendant on June 21, 2005, and learned that defendant was a heavy and chronic user of cocaine and heroin. Defendant told Mr. O'Donnell he was arrested at 12:30 a.m. on May 7, 2004, and that he had ingested 12 to 13 bags of heroin the day before he was arrested (including two bags about an hour prior to being arrested). Defendant further told Mr. O'Donnell that at the time of his arrest, he had seven "dime bags of heroin" hidden in the waistband of his pants, which he "exhausted" by approximately 5 a.m. on May 7, 2004, while in custody. Defendant told Mr. O'Donnell that "from that time on" he "started to experience withdrawal. He was primarily manifesting as stomach complaints, diarrhea, some vomiting, abdominal cramping, pain, a desire for sweets, asking for sweets, [lying] down, adopting the fetal position to relieve the abdominal cramping, which gradually over the course of time became worse in his description." Defendant told Mr. O'Donnell that the police promised him heroin in exchange for a statement.

¶ 38 Mr. O'Donnell testified he was made aware from the police reports that defendant signed a handwritten statement at 11:09 p.m. on May 7, 2004, which was about 18 hours after his reported last use of heroin at 5 a.m. When asked to explain defendant's withdrawal symptoms at the time of his handwritten statement, Mr. O'Donnell testified "[defendant] would be approaching or in the peak intensity of withdrawal at the time of the first statement and even before that."

¶ 39 Mr. O'Donnell testified he viewed defendant's videotaped statement, which defendant gave at 8:53 p.m. on May 8, 2004. Mr. O'Donnell stated that at the time defendant made his videotaped statement, he still would have been at the "peak of withdrawal experience." Mr. O'Donnell testified that in the videotape, defendant was bent over (which people in withdrawal will do to help relieve abdominal cramping) and had a runny nose, which is "consistent with withdrawal from heroin. It is a visible sign."

¶ 40    Mr. O'Donnell testified he reviewed medical records from Cook County jail and learned from them that when defendant was processed, he was identified as a chronic heroin user and given "Schedule A," also known as a "withdrawal cocktail," consisting of "an anti-spasmatic, anti-nauseant and anti-diarrheal to relieve some of the gastrointestinal effects of acute physical withdrawal."

¶ 41    Barry Hargan, a substance abuse specialist who used to be a certified drug counselor, testified he interviewed defendant in June 2005 and also reviewed defendant's videotaped statement and the police and medical records. Mr. Hargan testified that "from the time [defendant] was arrested to the time that he made his video statement *** he would have undergone very severe heroin withdrawal." Mr. Hargan testified "an individual who is going through withdrawal is too sick to participate in any meaningful dialogue or cognitive process."

¶ 42    Dr. Lourgos reviewed all the same information as the other experts. With regard to the videotaped statement, Dr. Lourgos testified that "the defendant was not in severe opiate withdrawal." Dr. Lourgos also pointed out that when defendant underwent an intake examination at Cermak Health Services in the jail one day after giving his videotaped statement, "none of those records indicated that he was evidencing signs of withdrawal. He did report heroin and cocaine dependence but the records indicate that his demeanor appeared appropriate and he was recommended for placement in the general population."

¶ 43    Dr. Henry testified that he "wouldn't say that opioid withdrawal affects one's ability to understand. It's more uncomfortable. It's more–it's what we call sematic. The withdrawal symptoms *** are gastrointestinal, there's tearing, there's goose flesh, there's bone pain, there are flu-like symptoms. But opioid withdrawal is generally not characterized by a change in cognitive ability." Dr. Henry stated there is no evidence that defendant's withdrawal symptoms rose to the level where they would substantively interfere with his intellectual capacity to understand and waive his *Miranda* rights. Dr. Henry further testified he had viewed defendant's videotaped statement and that he was of the opinion that defendant "was not suffering severe withdrawal."

¶ 44    Dr. Coleman testified that a person going through withdrawal is still able to converse, to answer questions, to give coherent answers, and to make voluntary choices. Dr. Coleman testified she, too, viewed defendant's videotaped statement and that he did not appear to her to be in any severe distress. He was able to communicate appropriately and was coherent, logical and organized.

¶ 45    At the conclusion of the evidentiary hearing, the trial court stated:

    "[T]he time frame that a lot of the opinion is based on with respect to when this defendant would be in withdrawal really all goes back to the defendant's self-report that his last use was on 5-7-04 at 5 a.m. in the police station, and I do not find that the defendant's self-report is reliable. *** I find that based on a complete review of all of the testimony in the case, coupled with the review that I saw of the video, I find that the defendant was not in severe withdrawal at the time of the statement. I find that the defendant's ability was not compromised to knowingly understand or to waive *Miranda*. I find under the totality of the circumstances that he did in fact knowingly waive *Miranda* and that the statement was voluntary, so, therefore, the motion is going

to be respectfully denied."

¶ 47    At trial, the victim's son, James Weathersby, testified that in November 2003, his mother, Virginia Warren, was 42 years old, suffered from asthma, and worked the late-night shift as a certified nursing assistant at the Glenbridge Nursing Home.

¶ 48    Officer Candace Milovich testified she was assigned to conduct a well-being check of the victim's apartment at 5218 West Crystal Street on November 21, 2003. Officer Milovich entered the apartment through the open back door near the kitchen. The apartment was messy and Officer Milovich found the victim dead in the bedroom. Officer Milovich secured the apartment for the detectives, who arrived a short time later.

¶ 49    Officer Frank Pierce and Officer William Moore testified that on November 21, 2003, they were assigned to investigate this case. They arrived at 5218 West Crystal Street at around 6 a.m. They entered the victim's apartment through the back door and discovered the victim dead in the bedroom between the dresser and the mattress. She was lying on her stomach with her knees spread apart. Her face was on the mattress and her right hand was on the box spring. There was a black mesh nylon tied around her right wrist. There was a white cloth in her mouth secured by a blue nylon strap wrapped around her head. She was wearing a white nurse's jacket and was naked from the waist down with her white scrubs and panties around her ankles. She had no cuts, bruises, or signs of bleeding.

¶ 50    The apartment had both front and rear entries and there was no sign of forced entry to either door or to any windows. The front door was bolted shut from the inside. The apartment was messy, but there were no signs of struggle.

¶ 51    There was a strong odor of Pine-Sol in the bedroom. From the bedroom dresser, the police collected a bottle of Pine-Sol, a bottle of hydrogen peroxide, and a McDonald's styrofoam cup. From the bedroom floor, they collected an open bottle of Tide, a full bottle of Pepsi, a white pull-over shirt, and two blue fingernails from the victim. The police dusted the apartment for fingerprints and recovered one lift from the medicine cabinet in the bathroom. When later tested at the crime lab, no latent prints were found on the Tide bottle or the Pepsi bottle, and the lift from the medicine cabinet was not suitable for comparison.

¶ 52    Dr. Nancy Jones, the chief medical examiner for Cook County, testified she performed the autopsy on the victim. The victim was wearing a short-sleeved white jacket, blue T-shirt, and plaid bra, and her lower clothing consisted of a pair of white slacks and cream colored panties which were both pushed below her thighs. A piece of black cloth was loosely knotted around her right wrist. A white sock was pressed very deeply into her mouth.

¶ 53    Dr. Jones testified the sock absorbed the moisture inside the victim's mouth and expanded, blocking the airway to the lungs. The victim's brain then swelled due to the lack of oxygen. The swelling of the victim's brain put pressure on structures at the bottom of the brain that controlled her heartbeat and respiration. Dr. Jones opined that the victim died as a result of asphyxia due to gagging and that the manner of death was homicide.

¶ 54 Jennifer Bell, an expert in DNA testing with the Illinois State Police Forensic Science Center, explained DNA testing to the jury. Ms. Bell testified she received several pieces of evidence in this case and that no semen was found on the victim's vaginal, oral and rectal swabs. No blood or semen was found on the victim's white scrub top.

¶ 55 Ms. Bell received a blood standard from the victim. Ms. Bell examined the victim's panties for the presence of semen and found that stains on the back side of the panties glowed under a special light source indicating the presence of semen. Ms. Bell conducted DNA analysis on the stain and extracted the DNA profiles of a female and a male. The female profile was consistent with the victim. Ms. Bell entered the unknown male profile into the Combined DNA Indexing System, which indicated "an association of that profile to [defendant]."

¶ 56 A buccal standard was taken from defendant on May 8, 2004. Ms. Bell compared the DNA from that standard with the DNA from the panties and concluded that the human male DNA profile in the semen stain matched the DNA profile of defendant. Such a profile would be expected to occur in approximately "1 in 79 quadrillion black, 1 in 93 quadrillion white, and 1 in 260 quadrillion Hispanic unrelated individuals."

¶ 57 Officer Brian Costanzo testified that at around 12:39 a.m. on May 7, 2004, defendant was arrested after a field interview in an area of high narcotics trade. Defendant was handcuffed and subjected to a pat-down search. The officers transported defendant to the police station, where his waistband was searched, but nothing was found. He was handcuffed to a wall at this point.

¶ 58 Detective Kevin McDonald testified that on May 7, 2004, he was notified that defendant was in custody. At 9:15 a.m. that day, he and Detective Jacobs met with defendant in an interview room at the police station. Defendant told them he needed to use the bathroom and that he was a heroin user and wanted something sweet to eat. Defendant was taken to the bathroom and also given pop, chips, coffee with sugar, and cookies. Detective Jacobs read defendant his *Miranda* rights. Defendant said he understood his rights and wanted to speak to them.

¶ 59 Defendant told the officers that in November 2003 he was living in his stepfather's apartment on the second floor at 5216 West Crystal Street, the same building where the victim rented an apartment. Defendant said he did not know the victim personally but had seen her going in and out of the building. Defendant said that on the day the victim's body was discovered, November 21, 2003, he was in his stepfather's apartment. Defendant said he was never inside the victim's apartment.

¶ 60 After the conversation with the officers ended, the detectives asked defendant to think more about that day, and they left the room.

¶ 61 At 10:30 a.m., Detectives McDonald and Jacobs met with defendant again. Detective Jacobs told defendant his *Miranda* rights were still in effect and defendant said he understood. Defendant said he had no specific memories of the days leading up to November 21, 2003, but he did remember being at his stepfather's apartment when the body was discovered. The detectives told defendant they "received a lot of phone records in regards to this investigation." Defendant told the detectives they should speak with his sister Nicole about those records as

- 12 -

she was in Cook County jail and had previously gotten into trouble at home for running up a large bill on a party line. The detectives met with Nicole at 1 p.m. At 5 p.m., the detectives called the felony review unit for the Cook County State's Attorney.

¶ 62    At 6:45 p.m., Detectives McDonald and Bogucki met with defendant. Detective McDonald advised defendant of his *Miranda* rights and he said he understood and agreed to talk with them. The detectives told defendant they had interviewed his sister and they told him that his DNA had been recovered at the scene. Defendant then said he wanted to tell them the truth. Defendant said that in the early morning hours of November 20, 2003, he entered the victim's apartment through a partially open rear bedroom window. He was looking for money and small items he could easily carry away and sell to buy drugs. Since he was known in the area, he tied a T-shirt around his face to hide his identity.

¶ 63    Defendant told the detectives that once inside the victim's apartment, he found $11 in change. He made several phone calls on the phone in the apartment. While he was on the phone, he heard someone approach the front door and try to get in, so he ran to the kitchen to hide. He tied the T-shirt around his face again. The victim entered the apartment and walked back to the bedroom. She then walked out of her bedroom and started walking into the living room area adjacent to the kitchen. As she approached the kitchen, the victim saw defendant's reflection on some glass doors. She stopped and asked, "Who's there, who's there?"

¶ 64    Defendant told the detectives that he took a folding pocketknife out of his pocket and approached the victim, who backed away from him to the wall of the living room. He grabbed her and forced her into the bedroom. He pushed her onto the bed and had her roll onto her stomach. Then he found a piece of cloth and tied her hands. He took a "rag" and "stuffed it in her mouth and tied that gag with a blue strap that he had found [lying] around." He pulled her pants and underpants down. She was half lying on the bed and her knees were on the floor. Defendant pulled down his own pants and placed his penis in her vagina and then in her anus. Then he ejaculated on the floor. He noticed there was some fecal matter on his penis so he took a rag and wiped it off. He went to the kitchen and got some Tide and Pine-Sol and cleaned up the area of the floor where he had ejaculated because he did not want his DNA to be found.

¶ 65    Defendant told the officers that at this point, the victim appeared to be having an asthma attack. Defendant got some water, splashed it on her face, and wiped her face with a towel. Defendant took the $11 and the victim's car keys and left by the back door of the apartment. He took the rag he had used to clean the floor and threw it out on Leamington Avenue. He got on a bus going south toward his girlfriend's house, but on the way he bought and used some drugs.

¶ 66    Detective McDonald testified defendant did not appear to be in pain or discomfort, although he did appear nervous and tired. No one ever told defendant they would give him heroin if he made a statement.

¶ 67    ASA David Williams testified that between 6 and 7 p.m. on May 7, 2008, he and ASA Todd Dombrowski went to the police station, where they met with defendant. Defendant was sitting unhandcuffed in a chair, and ASA Williams introduced himself and ASA Dombrowski to defendant and explained that they were prosecutors. ASA Williams advised defendant of his *Miranda* rights and defendant said he understood and was willing to speak to them. Defendant gave essentially the same account he had given earlier to the detectives, but he added some

- 13 -

details. He said he had known the victim since 2003, she lived in the building next door to his mother's house, and he would see her come and go from work. He then described his commission of the crime, adding the facts that he first rang the victim's doorbell, and when nobody answered he stacked up some milk crates and climbed through an open window.

¶ 68    The conversation lasted about 45 to 60 minutes. At one point, ASA Williams spoke to defendant alone and asked if he had any complaints about his treatment by the police and he said he did not. ASA Williams asked defendant how he wanted to memorialize the statement and defendant chose to give a handwritten statement. They relocated to a room with a table. As both ASAs asked defendant questions, ASA Dombrowski wrote out the statement, which defendant signed.

¶ 69    At trial, during the testimony of ASA Williams, defendant's handwritten statement was published to the jury. Other than the addition of some personal biographical information, the statement was virtually the same as the oral statements defendant had given earlier. In the statement, defendant acknowledged he had been treated well by the police, been given food and drink and allowed to use the bathroom, and that he was not then under the influence of drugs or alcohol. After taking the handwritten statement, ASA Williams left the police station.

¶ 70    ASA Williams returned to the police station sometime after 5 p.m. on May 8, 2004, and spoke to Detective Jacobs, who said defendant wanted to speak to him again. ASA Williams went into the interview room and met with defendant, who said he now wanted to make a videotaped statement because he wanted "to put in that [the victim's death] was an accident." ASA Williams called for a videographer, who arrived after 8 p.m. The videotaped statement began at 8:53 p.m. and was played in court for the jury. That statement, with the addition of defendant saying he did not mean to kill the victim, is substantially identical to his earlier handwritten statement.

¶ 71    Defendant called three expert witnesses, Barry Hargan, Dr. James O'Donnell, and Dr. James Sullivan, who testified that in their opinions defendant was undergoing severe heroin withdrawal while in police custody at the time he made his statements and that he has a low IQ.

¶ 72    In rebuttal, the State presented Dr. Stafford Henry, who testified that defendant was not suffering from severe heroin withdrawal at the time he made his statements.

¶ 73    Following all the evidence, the jury convicted defendant of three counts of first-degree murder, one count of home invasion, and two counts of aggravated criminal sexual assault (penis to vagina and penis to anus). At the sentencing hearing, the trial court specifically noted defendant's extensive prior criminal history, including his seven felony convictions, and determined that a lengthy period of incarceration was necessary to protect society from defendant. The trial court merged the home invasion count and the three first-degree murder counts into one count of first-degree murder, and sentenced defendant to a 60-year term of imprisonment for the first-degree murder conviction and to two 25-year terms of imprisonment for the aggravated criminal sexual assault convictions, all to be served consecutively. Defendant appeals.

¶ 74     First, defendant argues the trial court erred in granting the State's motion for a *Frye* hearing on the admissibility of his GSS results and ultimately finding that the GSS results failed to meet the *Frye* standard for admissibility.

¶ 75     "In Illinois, the admission of expert testimony is governed by the standard first expressed in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). [Citation.] Commonly called the 'general acceptance' test, the *Frye* standard dictates that scientific evidence is admissible at trial only if the methodology or scientific principle upon which the opinion is based is 'sufficiently established to have gained general acceptance in the particular field in which it belongs.' [Citation.] In this context, 'general acceptance' does not mean universal acceptance, and it does not require that the methodology in question be accepted by unanimity, consensus, or even a majority of experts. [Citation.] Instead, it is sufficient that the underlying method used to generate an expert's opinion is reasonably relied upon by experts in the relevant field. [Citation.] Significantly, the *Frye* test applies only to 'new' or 'novel' scientific methodologies. [Citation.] Generally speaking, a scientific methodology is considered 'new' or 'novel' if it is ' "original or striking" ' or 'does "not resembl[e] something formerly known or used." ' [Citation.]" *In re Commitment of Simons*, 213 Ill. 2d 523, 529-30 (2004). Scientific methodology is considered novel when the issue of its general acceptance in the relevant scientific community remains unsettled. *People v. McKown*, 226 Ill. 2d 245, 257-58 (2007).

¶ 76     *De novo* review applies when determining whether a *Frye* hearing was required and whether the scientific technique at issue is generally accepted in the relevant scientific community. *Simons*, 213 Ill. 2d at 531. The proponent of the scientific technique (defendant here) has the burden of establishing its general acceptance in the relevant scientific community. *People v. McKown*, 236 Ill. 2d 278, 294 (2010).

¶ 77     In the present case, defendant argues that the trial court erred in granting the State's motion for a *Frye* hearing on the admissibility of the GSS results, where the GSS is not new or novel. Defendant also argues that even if the *Frye* hearing was required to be held, the trial court erred in finding that the GSS was not generally accepted in the relevant scientific community.

¶ 78     In support of his arguments, defendant cites the testimony of Dr. Sullivan and Dr. Leska. As discussed, Dr. Sullivan testified that the GSS has been around since the mid-1980's and is generally accepted in the relevant field of forensic psychology. Dr. Leska similarly testified that the GSS has been around since 1987 and is generally accepted in the forensic psychology community. However, Dr. Sullivan also admitted to reviewing surveys indicating that the GSS is not currently being used in forensic psychological examinations. Dr. Sullivan also acknowledged that Bruce Frumkin, who wrote a chapter for a book he edited, stated in 2008 that the GSS is "unknown to many psychologists." Both Dr. Sullivan and Dr. Leska acknowledged that the GSS has been widely criticized as not providing an accurate measure of an American subject's suggestibility, because the normative data underlying the GSS comes from British and Icelandic subjects who do not share the same culture and vocabulary as Americans and, thus, are not representative of the American population on which the GSS is used. Dr. Sullivan and Dr. Leska also testified that the GSS tests the suggestibility of a subject's semantic memory, *i.e.*, his memory of concepts, words, and objects, as opposed to his autobiographical memory, *i.e.*, his memory of events he actually experienced. Dr. Leska

- 15 -

indicated that since a police interrogation focuses on the subject's autobiographical memory and not his semantic memory, the GSS has little value in determining the suggestibility of the subject's responses to the police interrogation. Dr. Leska agreed with a statement by Mr. Gudjonsson, the creator of the GSS, that the validity of the GSS in predicting suggestibility during an actual police interrogation is unknown. Both Dr. Sullivan and Dr. Leska testified that a person with a criminal history who has had prior contacts with the criminal justice system is less suggestible than a person without such contacts.

¶ 79    Dr. Coleman similarly testified to the GSS being an inaccurate measurement of an American subject's suggestibility during a police interrogation because the GSS was standardized or normed on a test group consisting of a population of British and Icelandic citizens who were not representative of the American population. Dr. Coleman also criticized the GSS for including in its test group persons other than pretrial detainees who had been interrogated by police; in her view, the inclusion of such other persons renders the GSS unreliable in measuring the suggestibility of a pretrial detainee such as defendant. Dr. Coleman further testified that as a clinical psychologist with the Forensic Clinical Services of Cook County, she has conducted thousands of *Miranda* evaluations and that she does not use the GSS because it is not "clinically relevant." Dr. Coleman also testified that the GSS is not generally accepted within the office of Forensic Clinical Services. Dr. Coleman testified that in her review of surveys of what doctors in the psychological field are using for testing, the GSS is not mentioned as an instrument used by forensic psychologists. Dr. Coleman specifically noted that Thomas Grisso, who is well known in the area of *Miranda* evaluations, had reevaluated his earlier determination that the GSS is "a useful tool in light of assessing *Miranda* abilities," and no longer recommended the GSS. Dr. Coleman concluded that the "GSS has not gained general acceptance in the field of psychology."

¶ 80    On all this evidence, we cannot say the trial court erred in granting a *Frye* hearing on the admissibility of defendant's GSS results, where the acceptance of the GSS in the field of forensic psychology was unsettled despite its almost 30-year existence and, thus, remained a novel scientific methodology. See *McKown*, 226 Ill. 2d at 257-58. Also on this evidence, defendant failed to meet his burden of showing that the GSS is reasonably relied upon by forensic psychologists when examining American pretrial detainees with an extensive prior criminal history, such as defendant here, to determine whether they understood their *Miranda* rights and/or to determine whether statements made during police interrogations were voluntary. Accordingly, we affirm the trial court's order granting the State's motion for a *Frye* hearing and barring the admission of defendant's GSS results.

¶ 81    Defendant argues that *People v. Nelson*, 235 Ill. 2d 386 (2009), compels a different result as it stands for the proposition that the GSS is generally accepted by forensic psychologists in Illinois. We disagree. In *Nelson*, the trial court there conducted a *Frye* hearing and found that the GSS "appeared to be generally accepted in the psychological community as one of many tests used by psychologists." *Id*. at 426. The trial court further found, though, that despite the general acceptance of the GSS, its reliability had not been established (*id*. at 431) and, therefore, that it did not meet the standard for admissibility under *Frye* (*id*. at 426). On appeal, the supreme court noted that the trial court had seemed to apply the "*Frye*-plus-reliability test"

in which "the trial court first determines whether a particular technique or methodology is generally accepted in the relevant scientific field. If the court determines that it is generally accepted, the court then considers whether it is reliable." *Id*. at 431. The supreme court held that "this standard is not the standard to be applied in Illinois. The determination of the reliability of an expert's methodology is naturally subsumed by the inquiry into whether it is generally accepted in the scientific community." *Id*. Accordingly, the supreme court concluded that the trial court had erred in its *Frye* analysis. *Id*. The supreme court did not pass any judgment on the trial court's finding that the GSS "appeared to be generally accepted in the psychological community as one of many tests used by psychologists." *Id*. at 426. Accordingly, contrary to defendant's argument, *Nelson* is not relevant to the instant case as it provides no authority from our supreme court regarding the GSS's general acceptance in the forensic psychological community.

¶ 82    Next, defendant contends the trial court erred in denying his amended motion to suppress, where the statements he made to the police and ASAs were not voluntary. "A court of review will accord great deference to the trial court's factual findings, and will reverse those findings only if they are against the manifest weight of the evidence; however, the court will review *de novo* the ultimate question posed by the legal challenge to a trial court's ruling on a motion to suppress. [Citations.] Where a defendant challenges the admissibility of his confession through a motion to suppress, the State has the burden of proving the confession was voluntary by a preponderance of the evidence. [Citations.] The concept of voluntariness includes proof that the defendant made a knowing and intelligent waiver of his privilege against self-incrimination and his right to counsel." *People v. Braggs*, 209 Ill. 2d 492, 505 (2003).

¶ 83    "To determine whether the defendant's confession was voluntary, we consider the totality of the circumstances surrounding it, including the defendant's age, intelligence, education, experience, and physical condition at the time of the detention and interrogation; the duration of the interrogation; the presence of *Miranda* warnings; the presence of any physical or mental abuse; and the legality and duration of the detention ***." *People v. Nicholas*, 218 Ill. 2d 104, 118 (2005).

¶ 84    In the present case, defendant does not argue that his statements were involuntary because the duration of the interrogation and detention was too lengthy. Nor does he argue that he was not given his *Miranda* warnings or that he was the subject of any physical or mental abuse. Rather, defendant's argument is that his statements were not voluntary because of his low IQ and diminished mental capacity and the fact that he was undergoing heroin withdrawal at the time he made the statements.[1]

---

[1]Defendant also contends that "the fact that the police did not bother to record the interrogation process strikes against the State." The recording of the interrogation process was not statutorily required until August 6, 2005, after defendant's interrogation here. See 725 ILCS 5/103-2.1(b) (West 2008) (added by Pub. Act 93-517, § 25 (eff. Aug. 6, 2005)). Further, defendant makes no argument on appeal that the interrogation process was abusive. Accordingly, the failure to record defendant's interrogation does not require reversal of the order denying his motion to suppress.

¶ 85    In support of his argument regarding his intellectual impairment, defendant cites the testimony of Dr. Sullivan that he had been hit in the head with a machete in 1995 and that he performed in the "impaired" range on neuropsychological screening measures. Dr. Sullivan also testified defendant has an IQ of 70, putting him in the second percentile of his age group, with fourth-grade reading and spelling skills and third-grade math skills.

¶ 86    In support of his argument regarding his heroin withdrawal, defendant cites the testimony of James O'Donnell and Barry Hargan that based on defendant's self-report of last ingesting heroin at 5 a.m. on May 7, 2004, he was undergoing severe heroin withdrawal at the time of his handwritten statement at 11:09 p.m. on May 7, 2004, and his videotaped statement at 8:53 p.m. on May 8, 2004. Mr. Hargan testified that defendant's severe heroin withdrawal rendered him "too sick to participate in any meaningful dialogue or cognitive process."

¶ 87    However, there was contrary testimony regarding defendant's intellectual impairment and the severity of his heroin withdrawal at the time he made his statements. Specifically, with regard to his cognitive functioning, Dr. Coleman testified she met with defendant in May and June of 2009, to evaluate his ability to understand *Miranda*. Dr. Coleman found defendant to be very engaging, alert and oriented and that his levels of reasoning, judgment and insight were adequate. Dr. Coleman concluded defendant would have been able to understand his *Miranda* rights when he made his inculpatory statements to the police and the ASAs. Dr. Lourgos evaluated defendant in July 2009 and also concluded defendant had the ability to understand *Miranda* warnings when he made his statements to the police and the ASAs. Dr. Henry met with defendant in February 2008 and determined he "was of average intelligence" and found no evidence of cognitive impairment. Dr. Henry also determined that at the time defendant made his statements, he possessed the capacity to knowingly and intelligently waive his *Miranda* rights.

¶ 88    With regard to the severity of defendant's heroin withdrawal, Dr. Lourgos reviewed the relevant records and viewed the videotaped confession and concluded that he "was not in severe opiate withdrawal" at the time he made the statements. Dr. Henry also viewed the videotaped confession and concluded that defendant was not suffering severe heroin withdrawal that would have substantively interfered with his intellectual capacity to understand and waive his *Miranda* rights. Dr. Coleman testified that a person undergoing withdrawal is capable of making voluntary choices, engaging in a conversation, and answering questions. She, too, viewed the videotaped confession and determined that defendant did not appear to be in severe distress, that he communicated appropriately, and that he was coherent, logical, and organized.

¶ 89    The trial court here expressly disbelieved defendant's self-report of last ingesting heroin while in custody at 5 a.m. on May 7, 2004, and the court obviously accorded the testimony of Dr. Coleman, Dr. Lourgos, and Dr. Henry greater weight than the testimony of Dr. Sullivan, Mr. O'Donnell, and Mr. Hargan in finding that defendant's statements were voluntarily made. "[Q]uestions regarding the credibility of witnesses, the resolution of evidentiary conflicts, and the determination of the amount of weight to which evidence is entitled are primarily the responsibility of the trier of fact, and a court of review typically will not substitute its judgment on such matters." *People v. Moorman*, 369 Ill. App. 3d 187, 190 (2006). The testimony of Dr.

Coleman, Dr. Lourgos, and Dr. Henry support the trial court's factual findings that defendant was not so cognitively impaired as to be unable to understand or waive *Miranda* and that he was not in severe heroin withdrawal at the time he made his statements. Accordingly, the trial court's factual findings were not against the manifest weight of the evidence. Said factual findings also support the trial court's ruling that defendant's statements were voluntarily made. The trial court committed no error in denying defendant's amended motion to suppress.

¶ 90    Further, in denying defendant's amended motion to suppress, the trial court also stated it had viewed the videotape of defendant's statement and saw no indication of severe heroin withdrawal impacting his ability to make a voluntary statement. We have also reviewed the videotape of defendant's statement (which was included in the record on appeal) and note that defendant sniffled and leaned over the table at which he sat for part of the time, but that he exhibited the ability to understand the questions and statements posed to him by the ASA regarding the sexual assault and murder and that he provided coherent, logical answers to said questions. We concur in the trial court's finding that defendant did not there exhibit any signs of severe heroin withdrawal that would render his statement unknowing and involuntary. Accordingly, we affirm the denial of the amended motion to suppress.

¶ 91    Finally, defendant contends his sentence was improper because the trial court erred in considering the victim's death, which was a factor inherent in the offense of murder, as an aggravating factor. When sentencing defendant on a murder conviction, the trial court may consider as an aggravating factor "the force employed and the physical manner in which the victim's death was brought about or the nature and circumstances of the offense." *People v. Saldivar*, 113 Ill. 2d 256, 271 (1986); *People v. Joe*, 207 Ill. App. 3d 1079, 1086 (1991). However, the trial court may not consider the end result of defendant's conduct, *i.e.*, the death of the victim, a factor which is implicit in every murder. *Id*. In other words, the single factor of the victim's death cannot be used both as an element of the offense of murder and as a basis for imposing a harsher sentence than otherwise might have been imposed. *People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 9. Such dual use of a single factor is referred to as "double enhancement." *Id*. Although the trial court has broad discretion in imposing a sentence (*id*.), the determination of whether the trial court made a double enhancement error is a question of law reviewed *de novo* (*People v. Chaney*, 379 Ill. App. 3d 524, 527 (2008)). Not every double enhancement error requires remand for resentencing; where the record indicates that the trial court's reference to the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence, a remand for resentencing is not required. *People v. Csaszar*, 375 Ill. App. 3d 929, 952 (2007).

¶ 92    In the present case, defendant contends comments made by the trial court during the sentencing hearing indicate it made a double enhancement error by improperly considering the victim's death, a factor implicit in the murder. Specifically, the trial court stated:

> "The factors in aggravation *** are as follows. Number one, whether or not the defendant's conduct caused or threatened serious physical harm. Here there can be nothing more than a murder and not only a murder, it was accompanied by an aggravated criminal sexual assault both penis to vagina and penis to anus. That preceded the actual death of [the victim]."

¶ 93    Our review of this comment indicates that the only time the trial court actually mentioned the victim's death was when it referred to the sexual assaults immediately preceding her murder. In other words, the primary focus of the trial court's comment was not on the victim's death but rather on the nature and circumstances of her murder, *i.e.*, that it occurred in the context of an "aggravated criminal sexual assault both penis to vagina and penis to anus." The trial court's consideration of the nature and circumstances of the victim's murder was not error. See *Saldivar*, 113 Ill. 2d at 271.

¶ 94    To the extent that the trial court's comment can be considered an improper reference to the end result of the defendant's conduct, *i.e.*, the victim's death, said comment was fleeting in nature. Of much more concern to the trial court was the defendant's prior criminal activity. Specifically, when discussing the mitigating factors, the trial court stated:

> "Whether the defendant's criminal conduct was the result of circumstances unlikely to recur, I can't say that at all. Basically from the time the defendant was an adult, even excluding his juvenile background, but from the time he got involved with the adult system in November of 1991, he has been continuously involved without taking really any break. He was sent to the penitentiary for awhile, back to it again, served seven felony convictions that he accumulated between 1991 and 2004, all of them involving at some point a stint in the penitentiary.
>
> In the earlier convictions as the pre-sentence investigation points out, he was given probation concurrently by Judge Singer in November of 1991, and then there were subsequent violations with penitentiary sentences and from there after, they've all been penitentiary sentences. So, based upon that background, in fact I would say that the defendant if he were allowed to be free ever again would most likely continue on in that path and commit additional crimes."

¶ 95    Later, when discussing the aggravating factors, the trial court stated:

> "The defendant's history of prior delinquency or criminal activity. That I already alluded to. The defendant has shown that he has been in and out of the penitentiary basically without much of a break at all from 1991 until this arrest on the first-degree murder on offense. Minimum sentence after minimum sentence and still back out committing additional crimes.
>
> I certainly give weight to the fact there are seven prior felony convictions that in and of itself is an enormous amount of aggravation in my view and it's giving weight to the fact that two of those prior convictions are significant crimes of violence. The robbery started out in 1991 and the 1992 armed robbery where he received the minimum sentence on a Class X felony of six years in the Department of Corrections."

¶ 96    The trial court concluded:

> "On November 20th, of 2003, [the victim] came home to her very modest and simple apartment at 5216 West Crystal. She was walking into what was to become the worst nightmare of her life. There was an individual who had broken into the home. The testimony was he got 11 dollars to help with his drug habits, but instead of just

taking what he could and fleeing back out the house through a window, he stayed and was on the phone.

It was that fateful moment when she came in the door and he heard her come in and he saw her reflection in the doorway and saw her come through the doorway, at that point [defendant] had a choice to make. He could have fled either out the front door or out the window that he came in or he could have stayed. And unfortunately for [the victim and for defendant] he chose to stay. His decision was not to flee, his decision was to take out a knife and lead her at knife point into her own bedroom. She was ordered face-down and her nurse's uniform, her pants were pulled down. She had a sock placed in her mouth with elastic around it to keep it in place so she couldn't secure any help from anybody and he then proceeded to rape her vaginally as well as anally.

And he left her there. The photos of the victim that were introduced at trial show her pretty much frozen in time, unlike most crime scene photos. She's in the same position she was in after he raped her from behind. Truly a horrific picture of this defendant's handiwork on that date and time.

*** [He] left her there with a gag in her mouth, a tube sock shoved in her mouth [and] kept in there with her hands tied. It's not mitigation he left her and didn't at least take it out and call 911. The relevance being whether she died in his presence or a few minutes after he walked out the door, certainly was not his intent to get her any help.

*** I find that society really needs to be protected from [defendant]. As to the offense of first-degree murder, I'm sentencing him to the maximum sentence of 60 years in the Department of Corrections, consecutive to [the two consecutive 25-year terms for aggravated criminal sexual assault]. It's my intent that you never ever walk the streets of our community again. It's my intent to keep the community safe from you in your continuing course of criminal conduct."

¶ 97    Our review of these comments again indicates that the trial court's focus was not on the victim's death but rather on the physical manner in which the victim's death was brought about and on the nature and circumstances of the offense, all of which are proper considerations during sentencing. *Id*. The trial court committed no reversible error in its consideration of the relevant factors in aggravation and mitigation, and committed no abuse of discretion in the sentence imposed. See *People v. Beals*, 162 Ill. 2d 497 (1994) (Where the trial court imposed an extended-term murder sentence, its statement during the sentencing hearing that the defendant's conduct " 'caused the ultimate harm. It caused the loss of a human life' " did not necessitate a remand for resentencing where the statement was "a general passing comment" and where the trial court properly relied on other aggravating factors in sentencing defendant.).

¶ 98    For the foregoing reasons, we affirm the trial court.

¶ 99    Affirmed.