2020 IL App (1st) 182054-U

No. 1-18-2054

Order filed December 22, 2020

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| | ) | |
| v. | ) | No. 11 CR 12410 |
| | ) | |
| | ) | Honorable |
| DEVIN BICKHAM, SR., | ) | Noreen V. Love and |
| | ) | Geary W. Kull, |
| Defendant-Appellant. | ) | Judges, presiding. |

PRESIDING JUSTICE SMITH delivered the judgment of the court.
Justices Lavin and Cobbs concurred in the judgment.

**ORDER**

¶ 1   *Held*: Defendant's 70-year sentence for first degree murder is affirmed over his claims that the court used an improper factor in aggravation and that the sentence does not reflect his rehabilitative potential.

¶ 2   Following a jury trial, defendant Devin Bickham Sr. was convicted of the first degree murder of Chervon Alexander and sentenced to 95 years' imprisonment. On direct appeal, we vacated one murder count pursuant to the one-act, one-crime doctrine and modified the mittimus

to reflect a conviction on one count of first degree murder with a firearm with the added aggravating factor, as found by the jury, that defendant committed the offense in a cold, calculated, and premeditated manner. We remanded for resentencing because the trial court used an improper sentencing range, and otherwise affirmed. See *People v. Bickham*, 2017 IL App (1st) 142895-U, *modified on denial of reh'g.*

¶ 3    After a second sentencing hearing, a different circuit court judge sentenced defendant to 70 years' imprisonment. Defendant appeals, arguing that the court used an improper factor in aggravation and that the sentence does not reflect his rehabilitative potential. We affirm.

¶ 4    This case arose from events on the evening of July 11, 2011, in River Forest, Illinois, when Chervon Alexander, defendant's newly pregnant girlfriend, was shot multiple times while sitting in the front passenger seat of defendant's car. Defendant and his son, Devin Bickham Jr., were tried in simultaneous but severed jury trials.[1] Our previous order contains a detailed recitation of the facts. See *id.* ¶¶ 3-23. Accordingly, we set forth only those facts relevant to defendant's claim in this appeal.

¶ 5    At trial, Mary Alexander,[2] Chervon's mother, testified that she learned of Chervon's relationship with defendant in 2011. Defendant and Chervon were engaged, and had set a wedding date of August 27, 2011. Later, Mary learned defendant was already married.

---

[1] Bickham Jr. and Cardell Taylor, another co-offender who was tried separately, were also convicted in connection with Chervon's murder. Neither is a party to this appeal. Prior to defendant's trial, the trial court granted the State's motion *in limine* to introduce statements against defendant, including a series of text messages, between defendant, his son, and Taylor that were made during the time of the murder pursuant to the coconspirator exception to the hearsay rule.

[2] Because Chervon Alexander, Mary Alexander, and another witness, Lavette Alexander, share a last name, we will refer to them by their first names for the remainder of this order. Our order on direct appeal gives the victim's first name as Chervon, but in this order, we adopt the spelling used in Mary's victim impact statement and most of the report of proceedings.

¶ 6     On the night of July 11, 2011, defendant visited Mary's house and played cards with her and Chervon at around 7:45 p.m. Defendant and Chervon left around 10 p.m. At 10:23 p.m., defendant called Mary and told her that Chervon had been shot. He seemed calm during the call.

¶ 7     Lavette Alexander, Chervon's sister-in-law, testified that in June 2011, defendant made a comment that she interpreted as suggesting Chervon was pregnant. On cross-examination, Lavette acknowledged that defendant did not actually state that Chervon was pregnant. On redirect, Lavette stated that defendant planned to move to Louisiana after he and Chervon married, but Chervon did not want to go.

¶ 8     Kimmie Martin testified that she and defendant married in 1999 and she filed for divorce in 2012. By July 2011, the two had "basically no marriage at all," and she did not see defendant often. During their marriage, she knew defendant saw other women, but did not know their identities. The State entered a stipulation that multiple officers would testify that during the investigation of Chervon's death, Martin told officers that she and defendant were happily married.

¶ 9     River Forest police officer Anthony Pluto testified that on July 11, 2011, he responded to a call of a shooting on the 7200 block of Division Avenue in River Forest, Illinois. There, he saw defendant run "from a bush or tree" towards Pluto's vehicle. Defendant, while on his cell phone, yelled, "they shot her." Defendant then directed Pluto to a vehicle, where Pluto saw Chervon "slumped over" and unresponsive in the front passenger seat. Defendant described the shooter as a black male wearing a white shirt who "fled the scene" in a "gray vehicle." Pluto broadcast the description and shortly thereafter heard an officer state over the radio that he stopped a vehicle that matched the description.

¶ 10    Pluto drove defendant to the curbed vehicle. When they arrived, Pluto saw Bickham Jr. and another man, Cardell Taylor, detained near other police vehicles. Pluto later learned that the vehicle occupied by Bickham Jr. and Taylor was registered to defendant. Pluto asked defendant if the detained men were involved in the shooting, and defendant initially stated, "It don't look like them." A minute later, defendant told Pluto one of the men was his son. Defendant claimed that he did not know why his son was in the area. Pluto was present when another officer recovered a firearm from the vehicle in which Bickham Jr. and Taylor were stopped. The firearm was empty when Pluto examined it.

¶ 11    On cross-examination, Pluto stated he did not see anyone near defendant's vehicle when he responded to the initial call and did not speak to other witnesses on the scene besides defendant. Two other witnesses were brought to the show-up, but neither identified Bickham Jr. or Taylor as the shooter.

¶ 12    Officer Daniel Miller testified that on July 11, 2011, he received a dispatch about a possible shooting. As he drove towards the scene in a marked police vehicle, he heard Pluto radio units to look for an African-American male in a white t-shirt driving in a silver or gray vehicle eastbound on Division. As Miller drove northbound on Harlem approaching Division, within two miles from the scene of the shooting, he saw a silver vehicle that matched Pluto's description driving south on Harlem near Randolph Avenue. Miller drove past the vehicle and noticed that the driver also matched Pluto's description, prompting Miller to make a U-turn, call for back-up, and curb the vehicle. During the traffic stop, Miller learned that Bickham Jr. was the driver, and Taylor was the passenger.

¶ 13    During the stop, another officer looked through the driver's side door and observed a firearm in the vehicle. Bickham Jr. told Miller that as he drove near Harlem and Division, an unknown African-American male threw the firearm into this lap. He was in the area to drive Taylor to see a woman who lived in Oak Park. During this conversation, Taylor sweat "profusely."

¶ 14    The State published footage from the dashcam in another officer's vehicle, which is included in the record on appeal. The footage depicts two police units curb Bickham Jr. and Taylor's vehicle and detain the men. An officer approaches the driver's side door and appears to shine his flashlight into the vehicle. Music from one of the units obscures any dialogue. Taylor is wearing a white, open, button-down shirt and shorts, while Bickham Jr. is wearing a white shirt and shorts.

¶ 15    On cross-examination, Miller stated that Bickham Jr. did not attempt to flee when Miller activated his emergency equipment.[3] When Bickham Jr. stated that someone threw the firearm in his lap, he was handcuffed but had not been Mirandized. At some point, Taylor said to Bickham Jr., "I want to get my money now."

¶ 16    On cross-examination by defendant's attorney, Miller stated that the Pluto's radio message described a suspect in a white shirt, not a white t-shirt.

¶ 17    River Forest police detective Daniel Pater testified that on July 11, 2011, he responded to the traffic stop of Bickham Jr. and Taylor and recovered a firearm from "directly underneath the driver's seat" of the vehicle.

---

[3] This testimony was adduced by Bickham Jr.'s attorney, who questioned Miller while both juries were present. Counsel for defendant did not expressly adopt Bickham Jr.'s attorney's cross-examination of Miller, but the trial court did not issue a limiting instruction to defendant's jury.

¶ 18    Dennis Barnes testified that he is friends with defendant, and in 1999, gifted defendant the firearm that the police recovered from the vehicle.

¶ 19    River Forest police detective Justin Labriola testified that on July 11, 2011, he responded to the scene of the shooting and saw four teenagers nearby. He also responded to the traffic stop, where he administered gunshot residue (GSR) tests to Bickham Jr. and Taylor. On July 12, 2011, at the police station, he performed GSR tests on defendant. Labriola also recovered two cell phones from the vehicle Bickham Jr. was driving.

¶ 20    The State introduced evidence that police collected live rounds, shell casings, and a piece of a tooth in and around the vehicle in which Alexander was shot, but did not find fingerprints suitable for comparison on the firearm located in the vehicle Bickham Jr. was driving. Buccal swabs were collected from defendant, Taylor, and Bickham Jr.

¶ 21    Stephanie Fumo testified that on July 11, 2011, she was with three friends in Dominican Priory Park near Harlem and Division. At some point, she heard voices near a parking lot and saw a man and a woman near a vehicle. She also noticed a third person standing near the vehicle. He wore a baggy, short-sleeved shirt, and shorts. Moments later, she heard three popping noises. She looked towards the direction of the sounds and saw the third person run. She later saw a vehicle drive away, though she did not see the third person enter the vehicle. Fumo also heard the first man "crying." She walked towards him, and heard him yelling, "my girlfriend got shot," and "she's dead." Fumo called 911. When the police arrived, they brought Fumo to a traffic stop and asked her if she recognized two men detained on the scene. She did not recognize either man. Officers then brought her to the police station.

¶ 22 On cross-examination, Fumo stated that at the police station she told the officers she recognized the vehicle at the show-up.

¶ 23 Bryan Johnson testified that he was with Fumo on July 11, 2011. Around 10:15 or 10:20 p.m., he heard three popping noises coming from the parking lot. He and Fumo walked towards the lot, and Johnson saw a man wearing a white shirt and khaki cargo shorts run across Division. Closer to the parking lot, he heard a different man yelling that his girlfriend had been shot. Fumo called the police, who arrived shortly thereafter. The police drove Johnson to the show-up. He could not recognize either man's face, though their clothing was similar to that of the man he saw run across Division.

¶ 24 The State entered a stipulation regarding the collection of DNA evidence. Ryan Paulsen, a DNA analyst for the Illinois State Police, testified that he received and analyzed buccal swabs from defendant, Bickham Jr., Taylor, and Chervon, and swabs from the firearm. Paulsen concluded that the swabs taken from the firearm showed a mixture of DNA from three individuals. Bickham Jr. could be excluded from these three individuals, while defendant and Taylor could not. One in six African-American males, one in six white males, and one in five Hispanic males also could not be excluded.

¶ 25 The State entered stipulations regarding evidence recovery, including cell phones belonging to Chervon, defendant, Bickham Jr., and Taylor. John Dziedzic, who works in digital forensics for the Illinois State Police, testified that he examined the data collected from defendant's and Bickham Jr.'s phones. The State published text messages and phone call information between defendant and Bickham Jr. demonstrating that they shared information regarding their locations

on July 11, 2011. Bickham Jr. texted defendant "On Lake" at 9:54:20. Defendant called Bickham Jr. at 10:08:33 for 33 seconds. At 10:19 p.m., defendant called 911.

¶ 26    Caryn Tucker, a forensic scientist for the Illinois State Police, testified that she examined the work of another firearm examiner, who tested the firearm and the recovered fired bullets from both the scene and Chervon's body, and also test-fired the firearm. The examiner determined that the firearm fired the recovered bullets, and Tucker agreed with that conclusion.

¶ 27    Mary Wong, a chemist for the Illinois State Police, testified that she studied the GSR tests for defendant, Bickham Jr., and Taylor. She concluded that Taylor and Bickham Jr. may not have discharged a firearm with either hand. She also considered two tests regarding defendant. Respecting the first, performed on a sample from defendant's left hand only, she concluded that defendant either discharged a firearm, was near a discharged firearm, or came in contact with a primer GSR-related item with his left hand. Regarding the second test, which used samples from both hands, Wong concluded that defendant may not have discharged a firearm with either hand. She also tested clothing samples taken from Taylor and Bickham Jr. Wong concluded that Taylor's sample came in contact with a primer GSR-related item or was near a discharged firearm. She concluded that Bickham Jr.'s shirt may not have been near a discharged firearm or may not have come in contact with a GSR-related item.

¶ 28    Dr. Joseph Cogan testified that he examined Chervon, and concluded that her cause of death was homicide caused by multiple gunshot wounds, and that she was pregnant at the time of death.

¶ 29    Defendant testified that he was unfaithful to Martin during their marriage. Bickham Jr. knew that defendant and Chervon were dating. Defendant proposed to Chervon in May 2011, and

he and Bickham Jr. had "arguments and disagreements" about defendant's "intentions" towards Chervon.

¶ 30    On July 11, 2011, defendant and Chervon played cards with Mary at her home, then drove to the park. Defendant texted Bickham Jr. where he and Chervon were going because defendant intended to have "further discussions" with Bickham Jr. about what they "had been discussing prior." When defendant and Chervon arrived at the park, he was "getting ready to have sex" with her, and reclined her seat. As defendant leaned over to kiss her, a "man came" and "began to shoot." Defendant reached over to cover Chervon, but the shots continued, so he "bailed out of the car." He kneeled by the rear driver's side tire until the shooting stopped, then tried to follow the shooter. Defendant described the shooter as a "[m]ale black, white shirt, colored shorts." By the time defendant saw the shooter, he was already fleeing through bushes, and defendant never saw his face. Defendant saw the man enter a "light colored sedan." Defendant then returned to his vehicle and called 911. He heard sirens and went to flag down the officers.

¶ 31    Defendant told the officers what happened and described the shooter. Shortly thereafter, the officers took defendant to a show-up of two men near Madison and Harlem. Defendant initially told the officers that he did not recognize the men, though moments later he told one of the officers that one of the men was his son. The police then took defendant to the police station.

¶ 32    Defendant acknowledged owning the firearm found in Bickham Jr. and Taylor's vehicle. He denied directing Bickham Jr. to the park that night to shoot Chervon or having any involvement with the shooting.

¶ 33    On cross-examination, defendant testified that he planned to divorce Martin before marrying Chervon. He had 10 to 20 girlfriends while he was married to Martin. He acknowledged

Taylor's phone number was in his phone's contact list. The last time he saw the firearm before the shooting, it was in a case on the shelf in his bedroom closet. Only after the shooting did defendant realize that Taylor was the shooter and had used defendant's firearm.

¶ 34    The jury found defendant guilty of first degree murder and found that a firearm was used in the commission of the offense and that defendant acted in a cold, calculated, and premeditated manner. The trial court denied defendant's motion for a new trial.

¶ 35    Defendant's presentence investigation (PSI) report showed that he was 39 years old at the time of the offense. He had no prior criminal record. Defendant had an associate degree in hotel and restaurant management and a certification in heating and air conditioning, and also worked as a police officer, truck driver, and doorman. He married Martin in 1999 and they divorced in 2012. Defendant had one child with Martin, and also helped raise Martin's 20-year-old son from a previous relationship and had three other children from previous relationships, including Bickham Jr.

¶ 36    At sentencing, Kathleen Paavilainen testified for the State that while working as a police officer in Waukegan, Illinois, she investigated sexual assault allegations brought by a minor against defendant, who was also a police officer at the time. During the investigation, defendant gave a written statement, which the State published. Therein, defendant explained that he ticketed the minor at a traffic stop, then began communicating with her by phone. The minor told defendant she was 18 years old, and they then engaged in sexual intercourse on multiple occasions.

¶ 37    Mary read a victim impact statement wherein she stated that Chervon's death "greatly affected" her and her family.

¶ 38    The State argued that defendant acted with a "cold and calculated plan to murder an innocent woman." It further contended that defendant revealed his poor character through his sexual relationship with an underaged girl, and destroyed his and Chervon's families. The prosecutor asked for the maximum sentence, and emphasized that the jury's verdict included a finding that defendant acted in a "cold, calculated, and premediated manner," requiring an increased sentencing range of 40 to 80 years, and that an additional 15 years should be added because "a firearm was used," for a total of 95 years.

¶ 39    Defense counsel argued in mitigation that defendant maintained his innocence and had rehabilitative potential given his education, work history, and lack of a prior criminal record.

¶ 40    The court entered judgment on two counts of first degree murder and sentenced defendant to two concurrent terms of 95 years' imprisonment. In so finding, the court stated that defendant committed a "horrible" crime and admitted to being a "liar" and a "cheater." The court further emphasized that defendant showed no remorse, preyed upon his own child to perpetrate the offense, and also preyed upon the minor with whom he allegedly had a sexual relationship. The court continued that defendant was "not a human being" and "should never have had a chance to walk the earth," and that, if possible, the court would sentence defendant to death. The court based its sentence on the extended range of 40 to 80 years for the cold, calculated, and premeditated enhancement, as well as the 15-year firearm enhancement.

¶ 41    On appeal, this court remanded for resentencing, finding that "the trial court's original sentence of 95 years in prison cannot stand here since only two options were available," namely, "a term sentence within a range of 35 to 75 years in prison *** or a natural life sentence." *Bickham*, 2017 IL App (1st) 142895-U, ¶ 72. Because a term had been imposed, a natural life sentence was

unavailable on remand unless the sentencing court based it on new misconduct by defendant in the time following the first sentence. *Id.* We also vacated a count of first degree murder pursuant to the one-act, one-crime doctrine, and corrected defendant's mittimus to only reflect a conviction on count III for first degree murder with a firearm, committed in a cold, calculated, and premeditated manner, because it was the most serious count supported by the jury's verdict. *Id.* ¶¶ 78-81.

¶ 42    On September 21, 2018, a second sentencing hearing occurred before a different judge. The parties adopted the transcript from the first hearing by stipulation and also stipulated "to the factual summary *** contained in the appellate order."

¶ 43    The State called Iyana Quinones, Chervon's daughter, who read a victim impact statement into the record. In the statement, Quinones explained that she needed counseling for years following the incident, has difficulty sleeping, and that her mother's absence "haunts" her.

¶ 44    Defendant called Martin, who testified that she divorced defendant following this case after 13 years of marriage. Martin described defendant as "loving" and "caring" with his children, whom he supported financially. He had seven children in total, and Martin believed he treated them all in this manner. Defendant was also a hard worker, and paid Martin's bills, mortgage, and supported Martin through nursing school.

¶ 45    Pastor Emmitt Hines testified that defendant had "surrendered" and "accepted the gift of salvation" while incarcerated. He sang in the choir, attended church at least once a day, and acted respectfully towards other inmates. Hines believed defendant was a "changed man."

¶ 46    Tasha Bickham,[4] defendant's sister, testified that he was "the best" brother and helped their mother "a lot." He helped raise Tasha because their mother was a single parent. During Hurricane

---

[4] Because Tasha Bickham and defendant have the same last name, we refer to her by her first name.

Katrina, defendant helped direct the police to their cousin, who was stranded on a roof, and defendant then drove to New Orleans to further aid their cousin. Tasha described defendant's relationship with his children as "[a]wesome."

¶ 47    Defendant stated in allocution that he had no criminal past or gang affiliation, was a "positive influence and role model in the community," and asked that the court have "mercy" on him. He expressed "remorse" in his "heart" for the "horrendous crime that occurred." Defendant also emphasized that he had been "extremely productive" while incarcerated. If released, defendant planned to "help prevent youths and adults from committing crimes."

¶ 48    Defense counsel introduced two certificates defendant received while incarcerated, one from Transforming Incarcerated Dads and one from Freedom from Fear.

¶ 49    The State argued in aggravation that defendant was the "mastermind" behind Chervon's death, and also emphasized defendant's alleged sexual relationship with a minor. The State contended that defendant built trust with those around him only to abuse that trust, citing Chervon, Martin, his son, and Chervon's family as examples. The prosecutor requested the maximum sentence of 75 years' imprisonment.

¶ 50    In mitigation, defense counsel argued that punishment is not the only goal of sentencing, defendant was not charged in connection with the minor, he supported his children, had a substantial work history, and showed improvement while incarcerated. Counsel asked the court to show "mercy" and sentence defendant to 35 years' imprisonment.

¶ 51    The second sentencing court sentenced defendant to 70 years' imprisonment. In so finding, the court noted that the appellate court did not find issue with the trial court's reasoning at the first sentencing hearing, only the sentencing range used. The second sentencing court cited defendant's

life of "manipulating others," and found his conduct was more egregious because of his education and work history in law enforcement, which provided an opportunity to avoid criminal conduct. The court also believed defendant's allocution demonstrated that he still had not accepted responsibility. In mitigation, the court considered defendant's religious involvement while incarcerated.

¶ 52    Defendant made an oral motion to reconsider without argument, and filed an accompanying written motion. The court denied the motion. While doing so, the court noted that defendant's family in attendance appeared upset, and addressed them, stating, "[Y]ou have [defendant]. Grant it (*sic*), he will be in a location where perhaps you don't want him. But you'll have him." The court added that defendant "exists" to "talk," "see," and "counsel you." The court continued that Chervon's "family does not have that young lady, and you should keep that in mind. Because I do."

¶ 53    On appeal, defendant first argues that his sentence is excessive because the second sentencing court improperly considered a factor inherent in his offense in aggravation, specifically the fact of Chervon's death. Defendant acknowledges that he did not make a timely objection to the court's comments, but argues that we may reach the issue on plain error review.[5]

¶ 54    A court may consider a claim not properly preserved through a timely objection and inclusion in a posttrial motion on plain error review where a clear or obvious error occurred and (1) the evidence is so closely balanced that "the error alone threatened to tip the scales of justice

---

[5] Defendant also argues in his reply brief that his failure to object should be excused because waiver rules may be relaxed where the trial court's conduct is at issue. We reject this argument for two reasons: (1) defendant makes no showing as to why the court would not have appropriately considered his objection, and (2) arguments raised for the first time in a reply brief are deemed forfeited and may not be considered by the reviewing court. See *People v. Clark*, 2014 IL App (1st) 130222, ¶ 24.

against the defendant, regardless of the seriousness of the error," or (2) the error was so serious that it impacted the fairness of the trial and "challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Harvey*, 2018 IL 122325, ¶ 15. We must first determine whether a clear or obvious error occurred. *Id.*

¶ 55    A sentencing court's decision is entitled to great deference from a reviewing court. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). The sentencing court may not, however, consider in aggravation a factor that is inherent in the offense of which the defendant was convicted because the legislature is understood to have incorporated such considerations into the statute. See *People v. Saldivar*, 113 Ill. 2d 256, 265-72 (1986) (citing *People v. Conover*, 84 Ill. 2d 400, 404-05 (1981)). The fact of a victim's death is inherent in a homicide offense, including first degree murder, and should not be considered in aggravation by the sentencing court. *Id.* at 272. The sentencing court is permitted to consider, however, the manner in which the death occurred and the severity of the conduct that caused the death. *Id.* at 269-70. Additionally, the sentencing court may consider the impact of the victim's death on his or her family, including through impact statements or testimony at the sentencing hearing. See 725 ILCS 120/3, 4, 6 (West 2010); *People v. Shaw*, 186 Ill. 2d 301, 351-52 (1998).

¶ 56    Where a sentencing court improperly considered a factor inherent in the offense, remand is not automatic, and instead the sentence should be affirmed where the reviewing court determines that the improper factor played an "insignificant" role in the sentencing court's reasoning. *People v. Shanklin*, 2014 IL App (1st) 120084, ¶ 91. Whether a sentencing court considered an improper factor in aggravation such that remand for resentencing is necessary is reviewed *de novo*. *People v. Bowen*, 2015 IL App (1st) 132046, ¶ 49.

¶ 57    Here, defendant argues that the second sentencing court, while addressing defendant's family, revealed that it improperly considered the fact of Chervon's death as an aggravating factor by admonishing defendant's family to keep in mind that Chervon's family no longer had her, concluding, "Because I do." Prior to these comments, multiple proper aggravating factors were adduced across two sentencing hearings. During the first hearing, the trial court received evidence that defendant engaged in a sexual relationship with a minor. The court also received a victim impact statement from Mary detailing the significant effect Chervon's death had on her family. During the second hearing, the sentencing court received another victim impact statement, and also heard defendant's ex-wife, prison pastor, and sister testify as to his rehabilitative potential. During its colloquy before sentencing defendant to 70 years' imprisonment, the court noted that defendant manipulated his son and Chervon, and found that his education and work history made his conduct more egregious because he had opportunities to avoid criminality.

¶ 58    On this record, we find that the second sentencing court did not commit a clear or obvious error by considering a factor inherent in the offense. The challenged comments were directed to defendant's family members, who were upset by the sentence. The court reminded them that while having their loved one in prison was painful, they could interact with him, whereas Chervon's family's pain differed because she would never again be available to them. In other words, the court explained that it kept in mind the impact of Chervon's death on her family in arriving at its sentence. This is a proper consideration. See 725 ILCS 120/3, 4, 6 (West 2010); see also *People v. Kelley*, 2019 IL App (4th) 160598, ¶ 117 (a sentencing court's consideration of the victim's family's grief does not constitute consideration of a factor inherent in the offense).

¶ 59    Even if we accepted defendant's interpretation of the sentencing court's comment, he would still not be entitled to relief. The court discussed myriad other factors in arriving at its sentence besides the fact of death, which it did not mention at all until after levying the sentence. It is thus apparent from the record that to the extent the court could be understood to have considered the fact of death in aggravation at all, it played an insignificant role in the sentencing calculus such that remand for resentencing would be inappropriate. *Shanklin*, 2014 IL App (1st) 120084, ¶ 91.

¶ 60    The sentencing court did not commit a clear or obvious error by considering a factor inherent in defendant's offense in aggravation, and thus plain error review is unavailable and defendant's claim fails.

¶ 61    Defendant next argues his sentence was excessive because it did not reflect the evidence in mitigation which demonstrated his rehabilitative potential.

¶ 62    A sentencing court must consider a defendant's rehabilitative potential as well as the seriousness of the offense at sentencing. Ill. Const. 1970, art. 1, § 11. The seriousness of the crime is the most important factor. *People v. Decatur*, 2015 IL App (1st) 130231, ¶ 12. A reviewing court gives great deference to the sentencing court's decision and will not substitute its judgment for that of the sentencing court. *People v. Alexander*, 239 Ill. 2d 205, 212-13 (2010). This is because the sentencing court was in a better position to judge a defendant's "credibility, demeanor, general moral character, mentality, social environment, habits, and age." *Stacey*, 193 Ill. 2d at 209. The reviewing court must consider the record as a whole when considering the propriety of a sentence, and not focus on "a few words or sentences." *People v. Andrews*, 2013 IL App (1st) 121623, ¶ 15.

¶ 63    The sentencing court will be presumed to have considered the appropriate factors in mitigation unless the defendant makes a positive showing from the record to rebut the presumption. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19. The sentencing court is not required to weigh a defendant's rehabilitative potential over the seriousness of the crime. *Alexander*, 239 Ill. 2d at 214. A sentence within the statutory range will not be deemed excessive unless it is "greatly at variance" with the law's purpose or "manifestly disproportionate" to the defendant's conduct. *Stacey*, 193 Ill. 2d at 210. A reviewing court will not reverse a lower court's sentencing decision absent an abuse of discretion. *Alexander*, 239 Ill. 2d at 212-13.

¶ 64    Generally, the sentencing range for first degree murder is 20 to 60 years' imprisonment. See 730 ILCS 5/5-4.5-20 (West 2010). In this case, a 15-year mandatory firearm enhancement increased the applicable range to 35 to 75 years. See 730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2010). The jury's additional finding that defendant committed the murder in a cold, calculated, and premeditated manner permitted a potential, discretionary sentence of natural life in prison. 720 ILCS 5/9-1(b)(11) (West 2010); 730 ILCS 5/5-8-1(a)(1)(b) (West 2010). Ultimately, the second sentencing court imposed a term of 70 years' imprisonment.

¶ 65    The factors in aggravation are described above. Regarding mitigation, at the first hearing, defense counsel cited defendant's work history, education, and the support he provided his family. At the second hearing, Martin, defendant's prison pastor, and his sister testified in mitigation, and defendant spoke in allocution. The sentencing court stated that it considered the pastor's testimony in mitigation, but believed that defendant's work history, education, and familial relationships made his conduct more egregious, and that defendant's allocution showed he did not accept responsibility for his conduct.

¶ 66 We find that defendant has not demonstrated the court abused its discretion by imposing an excessive sentence. Defendant's 70-year sentence is within the statutory range, and presumptively proper. As described above, the court considered multiple factors in aggravation and mitigation across two sentencing hearings, and ultimately based its decision on the seriousness of defendant's crime and the manner in which he committed it, specifically manipulating his loved ones. The court also considered in aggravation that defendant had a solid family and work background, which made his conduct egregious because he had other options than to engage in criminal conduct. These are appropriate bases for the court's sentence. See *Alexander*, 239 Ill. 2d at 213-14; *Stacey*, 193 Ill. 2d at 209.

¶ 67 Defendant argues that the court did not adequately weigh his rehabilitative potential. This argument fails for three reasons. First, the sentence is within the applicable range, and defendant identifies nothing indicating that the court improperly failed to consider evidence in mitigation, and thus does not meet his burden of rebutting the presumption of propriety. *Stacey*, 193 Ill. 2d at 210. Second, the record shows that the court weighed the seriousness of defendant's conduct and the manipulative manner in which he acted over defendant's rehabilitative potential, which was within its discretion. *Alexander*, 239 Ill. 2d at 214. And third, though the court only explicitly mentioned one mitigating factor it used to reduce his sentence, the law is clear that the court is not required to explicitly mention every basis for its sentencing decision. *People v. Brown*, 2018 IL App (1st) 160924, ¶ 18.

¶ 68 Without any positive evidence from the record that the court here did not consider all appropriate mitigating factors, defendant's argument amounts to a request that we substitute our

judgment for that of the second sentencing court's and rebalance the factors in his favor, which the law does not permit. *Alexander*, 239 Ill. 2d at 213.

¶ 69 Finally, we note that in this court's order on the first direct appeal, this court already considered defendant's aggravating and mitigating factors as presented at the first sentencing hearing and found that the trial court's decision to sentence defendant to the maximum allowed by law was reasonable. *Bickham*, 2017 IL App (1st) 142895-U, ¶ 71 ("we *** affirm the trial court's substantive basis for its sentencing determination and find no error in the factors it considered"). Here, the sentencing court believed the additional testimony regarding defendant's religious involvement warranted a lesser sentence than the maximum, which was within the court's discretion. But based on our review, the evidence presented at the second hearing does not alter the severity and nature of defendant's conduct such that this court would disagree with the previous order regarding whether a maximum sentence could be appropriate.

¶ 70 For the above reasons, we affirm the judgment of the circuit court.

¶ 71 Affirmed.